THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ROBERT B., individually and on behalf of C.B., a minor,<br><br>               Plaintiffs,<br><br>v.<br><br>PREMERA BLUE CROSS,<br><br>               Defendant. | **MEMORANDUM DECISION AND ORDER REGARDING [70] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND [85] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:20-cv-00187-DBB-CMR<br><br>District Judge David Barlow |

Before the court are the parties' cross-motions for summary judgment.[1] Robert B., individually and on behalf of C.B. (collectively "Plaintiffs"), brings two claims against Defendant Premera Blue Cross ("Premera") under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs assert Premera unlawfully denied C.B. benefits and violated the Mental Health Parity and Addiction Equity Act ("MHPAEA" or "Parity Act").[2] For the reasons below, the court grants in part, denies in part, and dismisses in part the cross-motions.[3]

## BACKGROUND

### *Plan Coverage and Applicable Guidelines*

Robert B. participates in a benefits plan under ERISA (the "Plan").[4] As Robert B.'s dependent, C.B. is also a Plan beneficiary.[5] Premera is the Plan's claims administrator.[6] To

---

[1] Pls.' Mot. Summ. J., ECF No. 70, filed Mar. 21, 2023; Def.'s Mot. Summ. J., ECF No. 85, filed May 10, 2023.
[2] Am. Compl. ¶¶ 44–95, ECF No. 36, filed Dec. 29, 2021.
[3] Having considered the parties' arguments and applicable law, the court finds that oral argument would not materially assist the court in reaching a decision. *See* DUCivR 7-1(g).
[4] Am. Compl. ¶ 3; Answer ¶ 3, ECF No. 56, filed Oct. 21, 2022.
[5] Am. Compl. ¶ 3; Answer ¶ 3.
[6] Am. Compl. ¶ 2; Answer ¶ 2.

1

determine whether benefits claims are medically necessary, Premera applies the "medical judgment and expertise of [m]edical [d]irectors" to "reasonably interpret the level of care covered for [the member]'s medical condition."[7] The term "medically necessary" means:

> Those covered services and supplies that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>
> - In accordance with generally accepted standards of medical practice;
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
> - Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the [patient's] diagnosis or treatment.[8]

To make medical necessity determinations, Premera uses InterQual's [Behavioral Health]: Child and Adolescent Psychiatry criteria ("InterQual Criteria").[9]

Under these guidelines, residential treatment center ("RTC") criteria are "used for a patient who has been admitted or is expected to be admitted to a psychiatric [RTC]."[10] A psychiatric RTC "is a licensed residential facility that provides medical monitoring and 24-hour individualized treatment to a group of individuals."[11] Minimum programming includes a psychiatric evaluation within 24 hours of admission and thereafter weekly evaluations, daily clinical assessments, creation of a discharge plan within 24 hours, a psychosocial assessment

---

[7] ECF No. 79-11, at 437. For ease of reference, the record cites are to the paginated ECF docket numbers.
[8] *Id.* at 440.
[9] *See id.* at 244–323, 407; ECF No. 79, at 35; ECF No. 79-11, at 344. The criteria pertain to patients ages 4 through 17. ECF No. 79-11, at 245.
[10] ECF No. 79-11, at 308.
[11] *Id.*

within 48 hours of admission, a medical history and physical exam, and therapy (individual, group, or family) at least three times a week.[12]

For a "[s]erious emotional disturbance[,]"[13] a patient must exhibit at least one severe functional impairment, at least one support system aggravator, symptoms that are persistent or repetitive over at least 6 months, and at least one symptom showing an inability to be managed safely within the community.[14] For continued care at an RTC, defined as care after 15 days, a patient with a serious emotional disturbance must show the following: at least one aggravator within the past week,[15] completion of required interventions within the past week,[16] and at least one qualifying symptom[17] within the last week.[18]

*Pertinent Medical History*

After moving to a new town in the seventh grade, C.B. started to struggle with depression.[19] When C.B.'s[20] family moved back to their hometown, C.B.'s anxiety "increased

---

[12] *Id.*

[13] *Id.* at 262. "Serious emotional disturbance refers to an individual who is under the age of 18 and has a diagnosed psychiatric disorder within the last 12 months that substantially limits or interferes with his/her ability to achieve or maintain developmentally appropriate adaptive, behavioral, cognitive, communication, or social skills." *Id.* at 297–98.

[14] *Id.* at 262.

[15] ECF No. 79-11, at 265 (i.e., interpersonal conflict that presents as hostile or intimidating/persistently argumentative/poor or intrusive boundaries/threatening/unable to establish positive peer or adult relationships).

[16] *Id.* (i.e., symptom management plan, daily clinical assessment, individual/family therapy three times a week, individual/family psychoeducation, weekly psychiatric evaluation, and school/vocational program).

[17] *Id.* (i.e., aggressive/assaultive behavior, angry outbursts, depersonalization, property destruction, easily frustrated/poor impulse control, homicidal ideation without intent, hypervigilance/paranoia, nonsuicidal self-injury, or persistent rule violations, medication-resistant with anxiety/depressive disorder/obsessive disorder/psychosis, psychomotor agitation, runaway, sexually inappropriate, or suicidal ideation without intent).

[18] *Id.*

[19] ECF No. 79-3, at 172.

[20] The court uses female pronouns to refer to C.B. in accord with her preferences. *See* Pls.' Mot. Summ. J. 3 n.2. However, the record cited herein predominately uses male with some female pronouns, resulting in both genders and gendered pronouns being used or quoted throughout.

significantly."[21] In high school, C.B. avoided friends and had panic attacks.[22] C.B. also began

having thoughts about self-harm.[23] As C.B.'s mother stated: "[H]is fuse became very, very short.

He was controlling about his computer time and got angry with anyone who wanted to use [it].

Whenever I intervened, he became very upset and always tried to rationalize his behavior."[24]

C.B.'s "depression and anxiety increased rapidly" and C.B. was removed from school.[25]

 C.B. transferred to an alternative school and attended class two hours each day, showing

"modest success."[26] But C.B. continued to display behavioral problems.[27] Sometimes during

school commutes, C.B. "would clench his fists and say he was going to jump out of the car."[28]

C.B. once tried to run away from a therapist's office.[29] C.B.'s parents reported "daily kid drama

among all the siblings. Everyone had to walk on eggshells around [C.B.] at all times due to

[C.B.'s] anger and eruptions."[30] C.B.'s mother was "frightened a couple of times, by the scary

looks [C.B.] would give [her]."[31] A psychiatrist noted how C.B. self-harmed by head-banging.[32]

 About a year before entering Elevations RTC ("Elevations"), C.B. met regularly with a

therapist and a psychiatrist.[33] Two months before entering the facility, C.B. started using a

---

[21] ECF No. 79-3, at 172.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.* at 176.
[26] ECF No. 79-3, at 176.
[27] *Id.* at 172.
[28] *Id.* The psychiatrist who evaluated C.B. at her admission to Seven Stars reported that C.B. "tried to jump out of the car 2 months ago. He will hold the car door like he's going to jump out when going to school, and parents are concerned that he might try this again." *Id.* at 197.
[29] *Id.* at 197.
[30] *Id.* at 175.
[31] ECF No. 79-3, at 175 (second alteration in original).
[32] *Id.* at 201.
[33] *Id.* at 177.

computer for sixteen to eighteen hours a day and paused only to eat or sleep.[34] C.B.'s mother "stopped enforcing the rules . . . due to concerns about every one's [sic] safety."[35]

*Admission to the Seven Stars Program at Elevations*

C.B.'s parents enrolled C.B. at Seven Stars on June 11, 2018.[36] Seven Stars is a program within the larger Elevations structure for teens facing neurodevelopmental disorders.[37] Upon C.B.'s admission, psychiatrist L. Kristin Shadow ("Dr. Shadow") conducted an initial evaluation. Dr. Shadow noted C.B. had existing diagnoses for depression, anxiety, and autism spectrum disorder ("ASD").[38] Notably, C.B.'s parents and C.B. gave different reasons for attending Seven Stars. C.B. stated: "I don't know what is wrong. My parents can easily answer that question. I thought that if it got like this I could get local help. I felt like I was doing better at home. I felt like I was getting enough school work as I could."[39] C.B. told Dr. Shadow that the problems started after being told about Seven Stars: C.B. "got really angry and sad" and was "not sure how [to] handle being away from . . . family for 2–2.5 months."[40] Yet her parents explained that C.B. needed help for "[a]nxiety attacks, MDD [major depressive disorder], not progressing in school because [lack of] focus, suicidal thoughts, complete isolation with 12+ hr per day of computer time, [and] not hanging out with friends."[41]

---

[34] *Id.* at 172.
[35] *Id.* at 197.
[36] ECF No. 79-3, at 171–72, 911.
[37] Decl. of Gwendolyn C. Payton ("Payton Decl.") ¶ 2 & Ex. 1, ECF No. 67-1, at 2. Seven Stars "provides a comprehensive therapeutic approach along with the experiential therapy of a wilderness or adventure therapy program." Ex. 1, at 2. The therapeutic model "combines residential treatment, classroom academics, outdoor adventure and experiential therapy, social skills development, life skill building, community activities, academic development, and behavioral shaping." *Id.*
[38] ECF No. 79-3, at 197.
[39] *Id.* at 196.
[40] *Id.* at 197.
[41] *Id.* at 196.

Dr. Shadow recorded several mental-health symptoms for C.B.: hopelessness, helplessness, depressed mood, decreased interest, worthlessness, thoughts of death, irritability, general worry/anxiety/stress more than half of the time, decreased concentration, separation anxiety, and suspiciousness.[42] As to risk of suicide and homicide, Dr. Shadow noted symptoms for suicidal ideation and a history of suicide attempts and threatening behavior.[43] Additionally, Dr. Shadow documented trauma symptoms: increased anger, emotional detachment, psychological distress, hypervigilance, and self-harm.[44] She also identified ASD symptoms.[45]

C.B. received a diagnosis for MDD, persistent depressive disorder, generalized anxiety disorder, chronic post-traumatic stress disorder, separation anxiety disorder of childhood, and autistic disorder.[46] Dr. Shadow listed the following reasons for treatment at Seven Stars: a high potential for psychiatric hospitalization but not needing 24-hour nursing care, recent suicide attempts, suicidal ideation with plan and intent, self-harm behavior, inadequate community support resources, an inability to care for physical needs, and a need for 24-hour supervision.[47] Dr. Shadow recommended C.B. stay at Seven Stars for 3–6 months.[48]

*Care at Seven Stars*

C.B. remained at Seven Stars from June 11 to September 30, 2018.[49] Two days after her admission, Seven Stars created a comprehensive treatment plan. The "Master Problem List"

---

[42] *Id.* at 200. The mental status exam revealed "thoughts of AWOL [absent without leave], no plans, but positive intent[.]" *Id.* at 203.
[43] ECF No. 79-3, at 200. The psychiatrist noted C.B. "self-harms by head banging" and had "passive thoughts of self[-]harm so he can go to the hospital so his parents would come[.]" *Id.* at 201, 203.
[44] *Id.* at 200.
[45] *Id.* at 200–01 (i.e., odd non-verbal behavior, impaired social reciprocity, inflexible-nonfunctional routines-rituals, repetitive motor movements, and intense sensory interests and problems).
[46] *Id.* at 203–04.
[47] *Id.* at 196.
[48] ECF No. 79-3, at 205.
[49] *Id.* at 911.

6

identified three disorders: MDD, generalized anxiety disorder, and ASD.[50] Seven Stars listed the following planned interventions: daily academic classes and weekly equine therapy, group therapy, activity for daily living, life skill group, milieu group, group recreational therapy, family therapy, and individual therapy.[51] As part of the Seven Stars program, C.B. often left the campus on therapeutic visits.[52] C.B. went on group camping trips including one that lasted from July 6 through about July 10, 2018.[53]

Dr. Shadow made periodic psychiatric progress entries. On June 21, Dr. Shadow reported C.B. having no suicidal or homicidal ideations and "[n]o current thoughts of [self-harm], . . . no plans, no intent, . . . [and] never self-harmed[.]"[54] Still, she also noted C.B. had self-harm thoughts "once or twice this past week, . . . say[ing] that he is not sure he can contract for safety."[55] Dr. Shadow also documented that C.B. "has talked to others in the past . . . before self[-]harm, [and] he is having fewer thoughts of self-harm than he used to[.]"[56] In addition, the physician noted C.B. had no thoughts or plans of running away despite past thoughts of doing so.[57] Five days later, Dr. Shadow documented no suicidal or homicidal ideations, no current self-harm thoughts despite "some passive [suicidal ideations] in the past[,]" and no thoughts of running away.[58] The progress notes for July 3 used the same language.[59]

---

[50] *Id.* at 1291.
[51] *Id.* at 1293–95.
[52] *See id.* at 1227 (July 3–4, 2018); *id.* at 1090–93 (Aug. 8–10, 2018); *id.* at 977–79, 985–86 (Sept. 13–16, 2018).
[53] *See* ECF No. 79-3, at 1207 (left on camping trip morning of July 6, 2018); *id.* at 1204 (camping the morning of July 11, 2018); *id.* at 1192 ("[C.B.] had a good time on the camping trip . . . ."). *But see id.* at 1202 (noting at therapy on July 10, 2018 that "[w]e discussed the camping trip that [C.B.] recently returned from").
[54] *Id.* at 1262.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] ECF No. 79-3, at 1249.
[59] *Id.* at 1216.

C.B. also attended individual and family therapy sessions. Therapy and daily tracking notes for July 10, 2018 reflected that C.B. had no thoughts of hurting self or others, and was able to engage in scheduled programming and complete daily tasks, but "seem[ed] to struggle mid-day emotionally."[60] The therapist noted that C.B. began "to focus on when he c[ould] leave Seven Stars and had difficulty redirecting."[61] Starting with the July 13 psychiatric progress notes, Dr. Shadow reported C.B. had no suicidal or homicidal ideations, thoughts of self-harm, or thoughts of escape.[62]

On August 16, 2018, Alison M. LaFollette ("Dr. LaFollette"), a licensed clinical psychologist, evaluated C.B. to "provide a more detailed conceptualization of his strengths, weaknesses, and psychological functioning."[63] Dr. LaFollette noted C.B. "did not describe having experienced hallucinations, delusions, or otherwise unusual thoughts"; "denied having experienced symptoms suggestive of a hypomanic or manic mood state"; "denied a history of self-harm or suicide attempts"; and "denied any continuing thoughts of suicide."[64] At no point did Elevations therapists indicate C.B. had current thoughts of hurting self or others while at Seven Stars.[65] But C.B. "reported monthly thoughts of suicidal ideation because 'things were sad

---

[60] *Id.* at 1199–202.

[61] *Id.* at 1202.

[62] *See id.* at 1189 (July 13, 2018); *id.* at 1269 (July 20, 2018); *id.* at 1132 (July 31, 2018); *id.* at 1075 (Aug. 16, 2018); *id.* at 1047 (Aug. 26, 2018); *id.* at 1149 (Aug. 27, 2018).

[63] ECF No. 79-3, at 172.

[64] *Id.* at 177.

[65] *See* Individual Therapy Notes: *id.* at 1282 (June 18, 2018); *id.* at 1254 (June 25, 2018); *id.* at 1228 (July 2, 2018); *id.* at 1201 (July 10, 2018); *id.* at 1195 (July 12, 2018); *id.* at 1180 (July 17, 2018); *id.* at 1164 (July 23, 2018); *id.* at 1141 (July 30, 2018); *id.* at 1107 (Aug. 6, 2018); *id.* at 1083 (Aug. 13, 2018); *id.* at 1059 (Aug. 21, 2018); *id.* at 1039 (Aug. 28, 2018); *id.* at 1013 (Sept. 5, 2018); *id.* at 1000 (Sept. 10, 2018); *id.* at 975 (Sept. 17, 2018); *id.* at 952 (Sept. 24, 2018). *See* Family Therapy Notes: *id.* at 1280 (June 18, 2018); *id.* at 1256 (June 25, 2018); *id.* at 1229 (July 2, 2018); *id.* at 1202 (July 10, 2018); *id.* at 1177 (July 17, 2018); *id.* at 1165–66 (July 23, 2018); *id.* at 1142 (July 30, 2018); *id.* at 1108 (Aug. 6, 2018); *id.* at 1085 (Aug. 13, 2018); *id.* at 1061 (Aug. 21, 2018); *id.* at 1010 (Sept. 6, 2018); *id.* at 996 (Sept. 10, 2018); *id.* at 970 (Sept. 17, 2018); *id.* at 950 (Sept. 24, 2018).

and [he] didn't know what to do.'"[66] Dr. LaFollette recommended that C.B. complete the Seven

Stars program to receive "24/7 therapeutic support" at a boarding school.[67]

*Care at Elevations RTC*

On September 30, 2018, C.B. transferred to Elevations for "further psychiatric

stabilization after completing programming in [Seven] Stars."[68] C.B.'s psychiatric

progress/discharge-transition note from Seven Stars indicated no hallucinations, illusions,

suicidal/homicidal ideations, or self-harm symptoms.[69] On October 1, Elevations generated an

addendum to the June 11 evaluation. The addendum noted that C.B. "denied safety concerns"[70]

and identified "anxiety and avoidance" as the "core issues [he would] face while continuing care

at Elevations."[71] Dr. Shadow recommended that C.B. continue "weekly individual and family

therapy with daily group type therapies including process group, peer feedback group, wellness

group, problem solving group, specialty group (upon further evaluation), and

recreational/experiential group (as safety allows)."[72] The next day, C.B.'s primary therapist

completed a self-harm/suicide risk assessment form. The form indicated C.B. had never

attempted suicide, had no suicidal thoughts, never committed self-harm, and did not have current

---

[66] ECF No. 79-3, at 177 (alteration in original) (citation omitted).
[67] *Id.* at 193.
[68] *Id.* at 911.
[69] *Id.* at 939.
[70] *Id.* at 919 ("[D]enies si/hi/self[-]harm ideation/awol ideation. Contracts for safety. No obvious manic or psychotic symptoms either observed or reported.").
[71] ECF No. 79-3, at 911; *id.* at 919 ("[T]ransition from the [Seven] Stars program to Elevations programming to continue therapeutic stabilization, particularly around social skill development which historically has lead [sic] to regression.").
[72] *Id.* at 919.

self-harm thoughts.[73] But the form also incongruously noted that "history reports [C.B.] engaged in self[-]harm via head banging sometime in the last year."[74]

Most progress notes from October 2018 through March 2019 indicated no risk of self-harm or suicide for C.B.[75] Yet a January 3, 2019 note discussing a "[p]assive, fleeing suicidal ideation," stated: C.B. "endorses having thoughts of suicide, but doesn't have a plan."[76] And two notes in February and March 2019 referenced a December 3, 2018 suicide attempt.[77] Five other therapy notes mentioned a risk of suicide or self-harm.[78] In contrast, numerous therapy notes reflected no suicidal or self-harm thoughts from October 2018 to March 2019.[79]

---

[73] *Id.* at 909.

[74] *Id.*

[75] *See id.* at 865 (Oct. 11, 2018); *id.* at 839 (Oct. 18, 2018); *id.* at 825 (Oct. 22, 2018); *id.* at 788 (Nov. 1, 2018); *id.* at 766 (Nov. 6, 2018); *id.* at 743 (Nov. 12, 2018); *id.* at 705 (Nov. 20, 2018); *id.* at 668 (Nov. 30, 2018); *id.* at 647 (Dec. 6, 2018); *id.* at 632 (Dec. 10, 2018); *id.* at 583 (Dec. 20, 2018); *id.* at 534 (Jan. 3, 2019); *id.* at 518 (Jan. 7, 2019); *id.* at 486 (Jan. 16, 2019); *id.* at 468 (Jan. 21, 2019); *id.* at 437 (Jan. 29, 2019); *id.* at 388 (Feb. 12, 2019); *id.* at 361 (Feb. 20, 2018); *id.* at 345 (Feb. 22, 2019); *id.* at 317 (Feb. 28, 2019); *id.* at 285 (Mar. 8, 2019); *id.* at 250 (Mar. 15, 2019).

[76] ECF No. 79-3, at 534.

[77] *Id.* at 317 (Feb. 28, 2019); *id.* at 285 (Mar. 8, 2019).

[78] *Id.* at 420 (Feb. 1, 2019); *id.* at 384 (Feb. 13, 2019); *id.* at 295 (Mar. 6, 2019); *id.* at 263 (Mar. 12, 2019); *id.* at 236 (Mar. 19, 2019).

[79] *See* Individual Therapy Notes: ECF No. 79-3, at 891 (Oct. 5, 2018); *id.* at 879–80 (Oct. 8, 2018); *id.* at 850 (Oct. 17, 2019); *id.* at 823 (Oct. 23, 2018); *id.* at 800 (Oct. 20, 2018); *id.* at 771 (Nov. 6, 2018); *id.* at 730 (Nov. 12–13, 2018); *id.* at 710 (Nov. 19, 2018, noting "N/A" with respect to danger and self-harm/suicide risk); *id.* at 651 (Dec. 6, 2018, noting "N/A" with respect to danger and self-harm/suicide risk); *id.* at 621 (Dec. 12, 2018, noting "N/A" with respect to danger and self-harm/suicide risk); *id.* at 603 (Dec. 18, 2018, noting "N/A" with respect to danger and self-harm/suicide risk); *id.* at 531 (Jan. 4, 2019, noting "N/A" with respect to danger and self-harm/suicide risk); *id.* at 509 (Jan. 9, 2019, noting "N/A" with respect to danger and self-harm/suicide risk); *id.* at 480 (Jan. 18, 2019, noting "N/A with respect to danger and self-harm/suicide risk); *id.* at 454 (Jan. 25, 2019, noting "N/A" with respect to danger and self-harm/suicide risk); *id.* at 434 (Jan. 30, 2019, noting "no recent reports" with respect to danger or self-harm/suicide risk); *id.* at 400 (Feb. 8, 2019, noting "N/A" with respect to danger risk and "[n]o thoughts" for self-harm/suicide risk); *id.* at 350 (Feb. 21–22, 2019); *id.* at 328 (Feb. 26, 2019, noting "N/A" with respect to danger risk and "[n]o thoughts" for self-harm/suicide risk). *See* Family Therapy Notes: *id.* at 843 (Oct. 18, 2018); *id.* at 811 (Oct. 26, 2018); *id.* at 792 (Nov. 1, 2018); *id.* at 754 (Nov. 8, 2018); *id.* at 722 (Nov. 15, 2018); *id.* at 676 (Nov. 29, 2018); *id.* at 649 (Dec. 6, 2018); *id.* at 618 (Dec. 13, 2018); *id.* at 586 (Dec. 20, 2018); *id.* at 529 (Jan. 4, 2019); *id.* at 517 (Jan. 7, 2019); *id.* at 494 (Jan. 14, 2019); *id.* at 469 (Jan. 21, 2019); *id.* at 412 (Feb. 4, 2019); *id.* at 377 (Feb. 15, 2019); *id.* at 350 (Feb. 21–22, 2019); *id.* at 296 (Mar. 6, 2019); *id.* at 249 (Mar. 15, 2019); *id.* at 224 (Mar. 21, 2019); *id.* at 209 (Mar. 25, 2019).

As in Seven Stars, C.B. left Elevations periodically for overnight therapeutic visits or camping trips.[80] C.B. was discharged from Elevations on June 6, 2019.[81]

*Denial of Benefits*

Premera initially approved C.B. for thirty days' treatment at Seven Stars.[82] On July 10, 2018, Premera conducted a review for medical necessity and denied further coverage.[83] C.B. received a denial letter the same day.[84] The letter, signed by the "Medical Director Team, Medical Management Department," indicated that reviewers had examined the insurance contract, the InterQual Criteria and guidelines for child and adolescent psychiatry, and Elevations medical records.[85] It stated that Elevations RTC did not meet guidelines for continued inpatient coverage after July 10 because the service was no longer medically necessary.[86]

The letter recited the Plan's requirements for continued residential treatment for a mental health condition as medically necessary when: "[1] A psychiatric evaluation is being done at least one time per week. [2] Clinical assessment by a licensed provider is being done at least one time per day. . . . [3] [I]ndividual or group or family therapy at least three times per week."[87] But the letter noted: "Information from your provider does not show that you are receiving these services. . . . [Y]ou have been away from the residential treatment facility since you left on

---

[80] ECF No. 79-3, at 842 (Oct. 26–28, 2018); *id.* at 689, 704 (Nov. 20–24, 2018); *id.* at 559, 576 (Dec. 22–28, 2018); *id.* at 358, 373 (Feb. 16–21, 2019); *id.* at 499 (Jan. 10–12, 2019).
[81] Am. Compl. ¶ 4.
[82] *Id.* at ¶¶ 4, 13; Answer ¶¶ 4, 13; ECF No. 79-11, at 181–85.
[83] ECF No. 79-11, at 285–86.
[84] *See* ECF No. 79, at 34 (denial ltr. dated July 10, 2018).
[85] *Id.* at 35.
[86] *Id.* at 34.
[87] *Id.* at 35.

7/6/18 to go on a camping trip, and that you therefore have not received any of these services since on or before 7/6/18."[88]

Last, the letter detailed C.B.'s options including discussing treatment alternatives with Dr. Shadow, submitting more medical records, discussing the decision with Premera's physician reviewers, continuing treatment at Elevations at full cost, or appealing.[89]

<em>Level I Appeal and Denial</em>

Robert B. appealed on December 17, 2018.[90] He disagreed with the adverse benefit determination for C.B. and claimed Premera violated federal law by "applying more stringent criteria to . . . intermediate behavioral health benefits, which are not applied comparably to . . . intermediate medical and surgical benefits."[91] As to Premera's statement that C.B. had not received requisite treatment after July 6, Robert B. contended the camping trip was "a short leave of absence" and C.B. "was receiving treatment during the dates of service in question[.]"[92] He argued C.B. had "experienced thoughts of hurting himself, has struggled in his interactions with peers, . . . has been hopeless and socially withdrawn at times . . . . [and] within recent weeks, . . . has again expressed suicidal ideations, thoughts of self-harm," and is questioning his gender identity.[93] Robert B. provided letters from two individuals who previously treated C.B.[94] Finally,

---

[88] *Id.*
[89] *Id.*
[90] ECF No. 79-5, at 239–56.
[91] *Id.* at 240–41.
[92] *Id.* at 241.
[93] *Id.* at 252–53.
[94] *Id.*; ECF No. 79-7, at 34 (letter from Christina L. Olson); *id.* at 36 (letter from Chris Shepley).

he submitted a letter from Elevation's medical director[95] discussing the benefits of residential treatment for adolescents.[96]

On January 14, 2019, Premera informed Robert B. it had denied his appeal.[97] The letter stated that care after July 10, 2018 was "not medically necessary . . . based on accepted medical standards" set forth in the "Summary Plan Description."[98] A "board-certified physician in Psychiatry and Child and Adolescent Psychiatry reviewed" medical records, the Plan, clinical criteria, and an independent, external medical review.[99] The following rationale was provided:

> The records from Elevations RTC from July 10, 2018, onward do not document serious thoughts of [C.B.] hurting himself or others. There is no report of constant hopelessness, or of frequent severe struggles with peers, no reports of suicidal or homicidal thoughts, no serious medication reactions, no medical diseases that need 24-hour supervision and no substance abuse problem, either. Difficulties with social interactions as well as feelings of depression and anxiety that are not severe do not need residential care. There are no documented behaviors in the records that are potentially dangerous or that cannot be treated in an ambulatory setting instead.[100]

The letter stated Robert B. could submit a Level II appeal or obtain an external review.[101]

An independent board-certified physician in child and adolescent psychiatry reviewed C.B.'s case. The physician stated that he reviewed all relevant information such as the medical records, Premera's denial letters, Robert B.'s appeal documents, Plan information, and InterQual

---

[95] Payton Decl. ¶ 4 & Ex. 3, ECF No. 67-1, at 17–18.
[96] ECF No. 79-6, at 38–39 (letter from Michael S. Connolly).
[97] ECF No. 79-3, at 24 (Level I appeal denial ltr. dated Jan. 14, 2019).
[98] *Id.*
[99] *Id.* at 25.
[100] *Id.* at 24.
[101] *Id.* at 25.

Criteria.[102] After summarizing C.B.'s condition,[103] the physician stated why he thought care was not medically necessary after July 10, 2018:

> The clinical notes dated from 7/10/18 do not document any ongoing suicidal or homicidal ideation. There is no self-injurious behavior. There are no psychotic symptoms. The patient is sad and cries at times. He is not aggressive or destructive in behavior. He is compliant with medication and treatment. He has been considered safe enough to go out on camping trips, visits home, and other activities in the facility which incorporate mountain biking, rafting, and skiing. He is able to do ADLs. There is no comorbid substance abuse disorder that would need 24-hour monitoring in a residential setting. He has no uncontrolled medical diseases that require residential care. There is therefore no compelling clinical rationale for continued residential mental health treatment from 7/10/18 forward. None of the InterQual [C]riteria Residential Treatment: Episode Day 16-X: Extended Stay, are met. Continued treatment at this level of care would be primarily custodial in nature.[104]

*Level II Appeal and Denial*

On February 27, 2019, Robert B. filed a Level II appeal.[105] He questioned whether Premera afforded C.B. a "full and fair review" because Premera allegedly "reused [its] original denial rationale and misrepresented the arguments [he] made in [his] level one member appeal[.]"[106] He argued C.B.'s "severe behavioral health issues" could not be "effectively

---

[102] ECF No. 79-11, at 176–77.

[103] *Id.* at 177 ("16-year-old male with major depression, anxiety, post-traumatic stress disorder (PTSD), and autism admitted to residential treatment on 6/11/18. He presented with a history of depressed mood, anxiety attacks, difficulty concentrating, declining academic functioning, preoccupation with video games, social isolation, and suicidal ideation. In the residential program, he was prescribed Lexapro and [C]lonazepam. The 7/3/18 psychiatric progress note documented that the patient had returned from a recent camping trip. His depression was rated 2 to 3/10 and anxiety 5/10. He denied suicidal and homicidal ideation. There was no reported aggression, self-harming, or psychosis. He was able to do activities of daily living (ADLs). The 6/27/18 progress note documented that the patient was 'very homesick. He went into his room crying.'" (citation omitted)).

[104] *Id.* at 178.

[105] ECF No. 79-3, at 1333–87.

[106] *Id.* at 1334–35.

addressed in only one month[.]"[107] In support, he cited excerpts from the medical record[108] and a

letter from C.B.'s Elevations therapist addressing C.B.'s treatment after October 1, 2018.[109]

Premera responded on April 22, 2019, stating that a panel had denied the appeal.[110] It

informed Robert B. that the panel had reviewed the Plan information, the appeal requests, the

InterQual Criteria, an external reviewer's report, and "[i]nformation . . . shared during the Level

Two Appeal Panel[.]"[111] The panel provided the following rationale:

> This decision was made based on the [P]lan language, which excludes coverage on any service or supply determined to be not medically necessary. The records from Elevations from July 10, 2018, do not meet the criteria for residential treatment center level of care. The records do not indicate after July 10, 2018, that [C.B.] had thoughts of hurting self or others, she was able to attend to activities of daily living and was able to go on a camping trip from July 5, 2018, through July 11, 2018. During this trip there were no clinical notes that [C.B.] received a psych evaluation. The records submitted do not show that [C.B.] meets the criteria outlined in the lnterQual® criteria for Residential Treatment.[112]

On April 15, 2019, a licensed physician who specialized in child and adolescent

psychiatry conducted an independent review.[113] The physician examined all appeal information,

medical records, Premera denial letters, Plan information, and pertinent InterQual Criteria.[114]

The physician described C.B. as presenting with "symptoms including panic attacks, social

isolation, temper outbursts, suicidal ideation, preoccupation with computer use, noise

---

[107] *Id.* at 1354 (emphasis removed).
[108] *Id.* at 1354–81.
[109] ECF No. 79-7, at 123–24.
[110] ECF No. 79-11, at 344 (Level II appeal denial ltr. dated Apr. 22, 2019). The panel consisted of a Physician Reviewer, who is a Medical Director Board-Certified in Pediatrics, a Clinician, and a Clinical Review Manager. *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.* at 351.
[114] *Id.* at 346.

hypersensitivity, family conflict and academic decline. . . . On 6/11/18 the patient expressed self-harming thoughts. From 7/11/18 on, the patient denied suicidal and homicidal ideation."[115]

Referencing the InterQual Criteria for an extended stay (more than fifteen days) at an RTC, the physician found C.B. had not met the required criteria.[116] He reasoned C.B. had not received a clinical assessment at least one time per day even though C.B. received therapy at least three times a week and a psychiatric evaluation at least one time each week.[117] The physician concluded Elevations did "not provide the intensity of services required at this level of care"[118] and that care after July 10, 2018 was not medically necessary:

> From 7/11/18 onwards, the patient denied suicidal and homicidal ideation, and was not self-harming, psychotic, aggressive, or unable to do activities of daily living (ADLs). These are the criteria that are recommended by the published medical literature to support continued residential treatment. The patient was medically stable and tolerating the medication without significant untoward side effects. As a result, the patient's treatment could have taken place in a less restrictive setting, which would have been more appropriate for treatment, on the dates of service in question.[119]

*Procedural Posture*

Plaintiffs filed their Complaint on December 30, 2020, alleging a denial-of-benefits claim and a MHPAEA (Parity Act) claim.[120] Premera moved to dismiss the Parity Act claim.[121] The court denied the motion[122] and granted Plaintiffs leave to file an amended complaint. They did so

---

[115] ECF No. 79-11, at 347.
[116] *Id.* at 348–49.
[117] *Id.* at 348.
[118] *Id.* at 349 ("[T]he patient's progress notes indicate that the patient went on . . . a camping trip on 7/6/18 as part of the programming, indicating that wilderness/camping-type activities are part of the program's treatment. The notes do not indicate that a clinical assessment by a licensed provider is documented at least once a day.").
[119] *Id.* at 348.
[120] ECF No. 2.
[121] ECF No. 13.
[122] ECF No. 22.

on December 29, 2021.[123] Three months later, Premera filed another motion to dismiss the Parity

Act claim.[124] In August 2022, the court granted in part and denied in part the motion.[125] The

parties filed cross-motions for summary judgment, which were fully briefed in August 2023.[126]

## STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment must be granted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."[127] "Where, as here, the parties in an ERISA case both move[]

for summary judgment . . . , 'summary judgment is merely a vehicle for deciding the case; the

factual determination of eligibility for benefits is decided solely on the administrative record, and

the . . . part[ies are] not entitled to the usual inferences in [their] favor.'"[128]

## DISCUSSION

The parties move for summary judgment on Plaintiffs' two claims: Premera's denial of

benefits and an alleged Parity Act violation. The court discusses each in turn.

### I.    Denial of Benefits Claim

ERISA "sets minimum standards for employer-sponsored health plans[.]"[129] Congress

enacted the regulations "to promote the interests of employees and their beneficiaries in

employee benefit plans, and to protect contractually defined benefits."[130] For this reason,

---

[123] *See* Am. Compl.
[124] ECF No. 39.
[125] ECF No. 51.
[126] ECF Nos. 70, 71, 73, 74, 85, 86, 90, 91.
[127] Fed. R. Civ. P. 56(a).
[128] *Carlile v. Reliance Standard Life Ins.*, 988 F.3d 1217, 1221 (10th Cir. 2021) (quoting *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010)).
[129] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023).
[130] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003) (citation omitted).

"ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."[131] The court first addresses the proper standard of review.

### A.    Standard of Review for the Denial of Benefits Claim

ERISA contemplates "'a distinct standard of review' for plan administrators' decisions."[132] Courts presumptively review ERISA claims de novo.[133] "When applying [this] standard in the ERISA context, the role of the court . . . is to determine whether the administrator made a correct decision. The administrator's decision is accorded no deference or presumption of correctness."[134] The "standard is not whether 'substantial evidence' or 'some evidence' supported the administrator's decision; it is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review."[135]

"But if a plan administrator enjoys discretionary authority under the plan, [courts] apply a deferential standard, affirming the decision unless it is arbitrary and capricious."[136] Courts will uphold the administrator's determination "so long as it was made on a reasoned basis and supported by substantial evidence."[137] "Substantial evidence requires more than a scintilla but

---

[131] *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1145 (10th Cir. 2023) (internal quotation marks omitted) (quoting *Conkright v. Frommert*, 559 U.S. 506, 517 (2010)).

[132] *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1065 (10th Cir. 2020) (citation omitted).

[133] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[134] *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished) (quoting *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

[135] *L.D. v. UnitedHealthcare Ins.*, ___ F. Supp. 3d ____, No. 1:21-cv-00121, 2023 WL 4847421, at *11 (D. Utah July 28, 2023) (quoting *Niles*, 269 F. App'x at 833).

[136] *Lyn M.*, 966 F.3d at 1065; *see LaAsmar*, 605 F.3d at 796 ("The court reviews the administrative record 'under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" (citation omitted)); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003) ("[I]n the context of an ongoing, good faith exchange of information between the administrator and the claimant, inconsequential violations of the deadlines or other procedural irregularities would not entitle the claimant to *de novo* review.").

[137] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

less than a preponderance."[138] It is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker."[139] "In determining whether the evidence in support of the administrator's decision is substantial, [courts] must take into account whatever in the record fairly detracts from its weight."[140] Defendants have the burden to show the arbitrary and capricious standard applies.[141]

Because the Plan delegates authority to Premera to make eligibility decisions,[142] Premera argues the Plan "clearly and unambiguously grants discretionary authority . . . to interpret the Plan's terms and determine benefits eligibility."[143] Plaintiffs concede this assertion,[144] but contend applicable state insurance law bars discretionary authority clauses.[145] Alternatively, they contend Premera's failure to comply with procedural requirements necessitates de novo review.[146] Premera does not respond to Plaintiffs' arguments as to the proper standard of review.[147] As such, Premera apparently concedes de novo review.[148] Even so, the court need not decide this issue since the result would be the same under either standard.

---

[138] *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (citation omitted).

[139] *Id.* (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992)).

[140] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 (10th Cir. 2023) (citation omitted).

[141] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1019 (D. Utah 2021).

[142] ECF No. 79-11, at 357 ("The Group has delegated authority to Premera Blue Cross to use its expertise and judgment as part of the routine operation of the plan to reasonably apply the terms of the contract for making decisions as they apply to specific eligibility, benefits and claims situations.").

[143] Def.'s Mot. Summ. J. 22.

[144] Pls.' Mot. Summ. J. 17 (admitting Premera has the authority to "determine eligibility for benefits or to construe the terms of the plan").

[145] *Id.* (citing Wash. Admin. Code § 284-44-015 (2023); Utah Code Ann. § 31A-21-314 (West 2023)).

[146] *Id.* (citing *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316–17 (10th Cir. 2009)).

[147] *See* Def.'s Opp'n to Pls.' Mot. Summ. J. ("Def.'s Opp'n"), ECF No. 86, filed May 10, 2023.

[148] *See, e.g., David v. Midway City*, No. 2:20-cv-00066, 2021 WL 6930939, at *16 (D. Utah Dec. 14, 2021), *appeal dismissed*, No. 22-4009, 2022 WL 3350513 (10th Cir. Aug. 3, 2022) ("[T]he [c]ourt concludes that [p]laintiffs have clearly conceded and/or abandoned their . . . claim and the other claims that they failed to defend in the *Memorandum* in opposition to the County's *Motion*." (citing *United States v. Garcia*, 52 F. Supp. 2d 1239, 1253 (D. Kan. 1999))); *Hinsdale v. City of Liberal*, 19 F. App'x 749, 769 (10th Cir. 2001) (unpublished)).

## B.    Full and Fair Review

Plan administrators "owe[] a special duty of loyalty to the plan beneficiaries."[149] They must provide a "reasonable opportunity to any participant whose claim for benefits has been denied [to receive] a full and fair review . . . ."[150] "Full and fair" review means claimants "know[] what evidence the decision-maker relied upon, hav[e] an opportunity to address the accuracy and reliability of the evidence, and . . . the decision-maker consider[s] the evidence presented by both parties prior to reaching and rendering [its] decision."[151] This includes not only giving claimants the "opportunity to submit written comments, documents, records, and other information relating to the claim for benefits" but also conducting a "review that takes into account all . . . information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."[152] "[A]dministrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record."[153]

This "full and fair" review includes a "meaningful dialogue" between plan administrators and beneficiaries.[154] "If benefits are denied[,] the reason for the denial must be stated in

---

[149] *D.K.*, 67 F.4th at 1236 (quoting *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 111 (2008)); *see David P.*, 77 F.4th at 1298–99.

[150] *D.K.*, 67 F.4th at 1236.

[151] *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988) (quoting *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., Local 813*, 715 F.2d 853, 858 n.5 (3rd Cir. 1983)).

[152] *David P.*, 77 F.4th at 1299 (quoting 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv)).

[153] *D.K.*, 67 F.4th at 1242 (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705–06 (10th Cir. 2018) (unpublished)); *see David P.*, 77 F.4th at 1312.

[154] *See D.K.*, 67 F.4th at 1240 ("In simple English, what [ERISA] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. . . . [I]f the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters." (quoting *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997))).

reasonably clear language[.]"[155] While administrators need not defer to the opinions of a beneficiary's treating physicians,[156] reviewers "may not arbitrarily refuse to credit such opinions if they constitute reliable evidence from the claimant."[157] In other words, reviewers "cannot shut their eyes to readily available information . . . [that may] confirm the beneficiary's theory of entitlement."[158] They must "engage with medical opinions in health benefit claims."[159] Indeed, "if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to the opinions."[160]

Benefit-denial letters must include the "specific reason or reasons for the adverse determination"; "the specific plan provisions on which the determination is based"; a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material is necessary"; and "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."[161] And administrators must communicate these rationales to claimants before litigation.[162]

---

[155] *David P.*, 77 F.4th at 1300 (quoting *Rasenack*, 585 F.3d at 1326).

[156] *Nord*, 538 U.S. at 831; *see id.* at 834 ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

[157] *D.K.*, 67 F.4th at 1237.

[158] *Id.* (alteration in original) (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)).

[159] *Id.* at 1239. With that said, "[t]his conclusion does not create any blanket requirement that a health plan administrator considering a claim for health care benefits must seek out all treating care givers' opinions found in a claimant's medical records and explain whether or not the plan administrator agrees with each of those opinions and why." *David P.*, 77 F.4th at 131.

[160] *D.K.*, 67 F.4th at 1241.

[161] *David P.*, 77 F.4th at 1299 (citing 29 C.F.R. § 2560.503-1(g)(1)).

[162] *See D.K.*, 67 F.4th at 1241 ("It cannot be that the depth of an administrator's engagement with medical opinion would be revealed only when the record is presented for litigation."); *see also David P.*, 77 F.4th at 1300–01 ("A plan administrator may not 'treat the administrative process as a trial run and offer a post hoc rationale in district court.'" (quoting *Spradley v. Owens-Illinois Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1141 (10th Cir. 2012))).

The court now turns to Premera's denial letters and associated external reviews.

### 1.    Premera's Denial Letters and Accompanying External Reviews

Premera's initial denial letter stated that Elevations "doesn't meet guidelines for continued inpatient coverage after July 10, 2018."[163] Premera offered two reasons. First, it declared: "Continued residential treatment for a mental health condition is denied as not medically necessary" because "[i]nformation from [Elevations] does not show any of the situations" set forth in the guidelines.[164] Second, Premera indicated that "[i]nformation from [Elevations] does not show that [C.B. is] receiving" required care for continued residential treatment for a mental health condition.[165] Premera noted that C.B. "ha[s] been away from [Elevations] . . . to go on a camping trip, and that [C.B.] therefore ha[s] not received any of these services since on or before 7/6/18."[166]

Next, Premera stated in its Level I appeal denial letter that continued RTC care was "not medically necessary" "based on accepted medical standards."[167] Premera remarked: "[t]here are no documented behaviors in the records that are potentially dangerous or cannot be treated in an ambulatory setting instead."[168] Responding to Robert B.'s Level II appeal, Premera's third denial letter reiterated that the Elevations records "do not meet the criteria for [RTC] level of care."[169]

---

[163] ECF No. 79, at 34.
[164] *Id.* at 35.
[165] *Id.*
[166] *Id.*
[167] ECF No. 79-3, at 24.
[168] *Id.*
[169] ECF No. 79-11, at 344.

Premera also included two reports from independent reviewers.[170] The first reviewer concluded, after having examined relevant information, that "[n]one of the InterQual [C]riteria" for residential treatment after fifteen days are met.[171] He stated that "[t]here are no documented behaviors that . . . cannot be treated in an ambulatory setting instead."[172] "There is therefore no compelling clinical rationale for continued residential mental health treatment . . . . Continued treatment at this level of care would be primarily custodial in nature."[173]

The second reviewer found, "[b]ased on the provided clinical documentation and the medical policy[,]" that "Premera's initial determination and rationale that the continued [RTC] stay after 7/10/18 . . . is not medically necessary should be upheld."[174] The reviewer explained: "[C.B.] do[es] not need a 24-hour residential treatment center. . . . [C]are could be done in an outpatient setting."[175]

Before turning to Plaintiffs' arguments as to why Premera violated ERISA, the court addresses the contention that the court should not consider the external reviewers' reports.

### 2.    Whether the Court Should Consider the External Reviewers' Reports

Plaintiffs contend the external reviewers' conclusions are irrelevant. They assert Premera's "denial[s] must rest on [their] own strength"[176] and so Premera cannot rely on

---

[170] *See* Def.'s Opp'n 12; Def.'s Reply in Support of Mot. Summ. J. ("Def.'s Reply") 3, ECF No. 73, filed Apr. 27, 2023 (explaining that the reviewers' reports were attached to the denial letters). Plaintiffs do not argue otherwise. *See* Pls.' Opp'n to Def.'s Mot. Summ. J. ("Pls.' Opp'n") 8–9, ECF No. 71, filed Apr. 13, 2023. The second and third denial letters state that the administrator reviewed the external physicians' reports. *See* ECF No. 79-3, at 25 (reviewing the "Same specialty review report"); ECF No. 79-11, at 344 (reviewing the "Level II same specialty reviewer report"). The record confirms that these specialty review reports were independent medical reviews. *See, e.g.*, ECF No. 79-11, at 175–79.
[171] ECF No. 79-3, at 30.
[172] ECF No. 79-11, at 178.
[173] *Id.*
[174] *Id.* at 349.
[175] *Id.* at 347; *see id.* at 348 ("[C.B.]'s treatment could have taken place in a less restrictive setting[.]").
[176] Pls.' Opp'n 8.

"[r]ationales and factual evidence later cited by external reviewers."[177] Premera responds that it correctly consulted external reviewers.

Plan administrators routinely consider medical experts' reports when determining medical necessity.[178] In fact, federal regulations direct plan administrators to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment[.]"[179] Of course, an administrator does not have to refer a claim to an *external* reviewer before making an initial benefits determination.[180] But such reviews are often considered in ERISA litigation.[181]

In this case, Premera supplemented its denial letters with two external reviewers' reports. Plaintiffs cite *David P. v. United Healthcare Insurance Co.*[182] for the proposition that an administrator cannot "hide behind an independent reviewer's acts and call them its own."[183] Yet the court in *David P.* did not state categorically that external reviewers' rationales are irrelevant.

---

[177] *Id.* at 8–9 (citing *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1122 (D. Utah 2021), *aff'd in part, vacated in part, rev'd in part*, 77 F.4th 1293 (10th Cir. 2023)).

[178] *See, e.g.*, *Ellis v. Liberty Life Assurance Co. of Bos.*, 958 F.3d 1271, 1294–95 (10th Cir. 2020); *Gaither*, 394 F.3d at 802–03; *Blair v. Alcatel-Lucent Long Term Disability Plan*, 688 F. App'x 568, 575 (10th Cir. 2017) (unpublished).

[179] 29 C.F.R. § 2560.503-1(h)(3)(iii).

[180] *See Easter v. Hartford Life & Accident Ins. Co.*, No. 21-4106, 2023 WL 3994383, at *7 (10th Cir. June 14, 2023) (not selected for publication).

[181] *See, e.g.*, *Mark M. v. United Behav. Health*, No. 2:18-cv-00018, 2020 WL 5259345, at *12 (D. Utah Sept. 3, 2020) (noting that an external review agency "found the treatment [as] not medically necessary"); *Jennifer L. v. United of Omaha Life Ins. Co.*, No. 2:18-cv-00848, 2020 WL 5659483, at *14 (D. Utah Sept. 23, 2020); *Weiss v. Banner Health*, 416 F. Supp. 3d 1178, 1188–89 (D. Colo. 2019) ("[Plan administrator] granted [p]laintiff an external review by an independent reviewer, who conducted a reasoned analysis of the claim and reached the same result as [the administrator]."); *Amy G. v. United Healthcare*, No. 2:17-cv-00427, 2018 WL 2303156, at *5 (D. Utah May 21, 2018) ("[T]he external review performed by an additional health care professional similarly determined that treatment at a residential treatment facility was not appropriate."); *Tracy O. v. Anthem Blue Cross Life & Health Ins. Co.*, No. 2:16-cv-00422, 2017 WL 3437672, at *9 (D. Utah Aug. 10, 2017), *aff'd*, 807 F. App'x 845 (10th Cir. 2020) (unpublished) (finding that the "conclusions are further supported by the independent review"); *Liebel v. Aetna Life Ins. Co.*, No. CIV-12-1315, 2014 WL 348965, at *4 (W.D. Okla. Jan. 31, 2014), *aff'd*, 595 F. App'x 755 (10th Cir. 2014) (unpublished).

[182] 564 F. Supp. 3d 1100.

[183] Pls.' Opp'n 9.

The court simply "prioritized the rationales" in the administrator's denial letters and rejected the idea that "later cited" evidence identified by external reviewers could salvage the administrator's deficient process.[184]

Here, the two external reviews are contemporaneous with the administrator's denials of Robert B.'s appeals.[185] They do not constitute "later cited" evidence. They are appropriately considered in determining whether Premera violated ERISA, despite the obvious importance of the benefit denial letters themselves.

### 3.   Plaintiffs' Benefits Determination Arguments

Plaintiffs offer three primary arguments for why Premera violated ERISA in making its benefits determination: (1) the InterQual Criteria impermissibly limited the medical necessity language in the plan; (2) treatment at Elevations was medically necessary because C.B. displayed qualifying symptoms; and (3) Premera ignored C.B.'s treating professionals' medical necessity opinions. The court treats each argument in order.

### a.   The InterQual Criteria

Citing *McGraw v. Prudential Insurance Co. of America*,[186] Plaintiffs cursorily contend that "Premera's use of the InterQual Criteria limited the scope of the medical necessity definition in the Plan's terms."[187] But *McGraw* did not hold that plan administrators may not use criteria or guidelines to help them determine whether certain treatments are medically necessary. Nor did *McGraw* address the InterQual Criteria at issue here. Instead, the court examined language from

---

[184] *David P.*, 564 F. Supp. 3d at 1122.
[185] *Compare* ECF No. 79-3, at 28–30 (external review ltr. dated Jan. 14, 2019), *and* ECF No. 79-11, at 346–50 (external review ltr. dated Apr. 15, 2019), *with* ECF No. 79-3, at 24–25 (Level I appeal denial ltr. dated Jan. 14, 2019), *and* ECF No. 79-11, at 344–45 (Level II appeal denial ltr. dated Apr. 22, 2019).
[186] 137 F.3d 1253 (10th Cir. 1998).
[187] Pls.' Mot. Summ. J. 24.

a different insurance plan and determined that a "confidential, internal" memo was being used improperly to result in an "unreasonable" interpretation of the plan.[188] Plaintiffs cite no authority suggesting that the use of the InterQual Criteria is improper and do not develop their argument further. On this record, their criticism is not supported.

### b.   Qualifying Symptoms

Plaintiffs also argue that C.B. "displayed qualifying symptoms."[189] Among these, Plaintiffs point to several symptoms and behaviors that do not seemingly meet the InterQual Criteria, like struggling with anxiety, emotions, or forming friendships and bonds with others.[190] However, Plaintiffs also identify "suicidal ideation," which is a qualifying symptom under the InterQual Criteria.[191] "Suicidal ideation includes not only active ideation that entails serious thoughts and/or plans to commit suicide but also passive ideation without an active plan, intent or means."[192]

The record contains evidence of suicidal ideation. On August 16, 2018, a psychologist examining C.B. found that she "reported monthly thoughts of suicidal ideation," but that the thoughts were not ongoing.[193] In his Level II appeal, Robert B. cited a letter from Phyllis Hawks ("Counselor Hawks"), one of C.B.'s therapists at Elevations. Counselor Hawks explained how C.B. vocalized suicidal thoughts in November 2018.[194] Additionally, an Elevations shift log note

---

[188] *McGraw*, 137 F.3d at 1260. The court also noted that the plan administrator "testified the guideline was not intended to be binding." *Id.* at 1260 n.13.

[189] Pls.' Mot. Summ. J. 24.

[190] *Id.*

[191] ECF No. 79-11, at 265. Plaintiffs also summarily reference "yelling at staff, throwing food, punching others, and not following directions." Pls.' Mot. Summ. J. 24. Plaintiffs cite a large block of records instead of specific examples, but the court finds only isolated instances of actual conduct. *See, e.g.*, ECF No. 79-3, at 1359, 1373. Plaintiffs do not further develop this argument, so neither does the court.

[192] ECF No. 79-11, at 293.

[193] ECF No. 79-3, at 177. The court notes that it is not entirely clear when the "monthly thoughts" were occurring.

[194] *Id.* at 1353 ("Maybe it'd be better if I didn't exist[.]").

alludes to a December 2018 suicide attempt.[195] Robert B. also directed Premera to a January

2019 note stating how C.B. "shared that he has been experiencing suicidal ideation . . . ."[196] A

psychiatric progress note from the same time period describes how C.B. "endorses having

thoughts of suicide[.]"[197] And a February 1, 2019 shift log note reported that "[C.B.] was feeling

unsafe and had a plan for suicide."[198] Other records from March 2019 reflect "recent" suicidal

thoughts.[199]

 Premera did not acknowledge Plaintiffs' assertions that C.B. expressed suicidal ideations

at any time after July 10, 2018, or cite any of the aforementioned record evidence. To the

contrary, Premera plainly stated in its Level I appeal denial letter: "There [are] . . . no reports of

suicidal . . . thoughts."[200] Likewise, Premera asserted in its Level II appeal denial letter that

"[t]he records do not indicate after July 10, 2018, that [C.B.] had thoughts of hurting self or

others[.]"[201] Similarly, both external reviewers asserted C.B.'s supposed lack of suicidal

ideations after July 10, 2018.[202]

 As noted above, the record shows that Premera and its external reviewers' categorical

denials were simply wrong. Various records across multiple months suggest C.B. had suicidal

thoughts after July 10, 2018. In its briefing, Premera now acknowledges that the record contains

"references to C.B. having thoughts of self-harm" and that therapeutic notes indicate "C.B.

---

[195] ECF No. 79-1, at 242 (C.B. admitting to "having dark thoughts").
[196] ECF No. 79-3, at 1377.
[197] *Id.* at 534.
[198] *Id.* at 420.
[199] *Id.* at 236, 263, 295.
[200] *Id.* at 24.
[201] ECF No. 79-11, at 344.
[202] ECF No. 79-3, at 30 ("The clinical notes dated from 7/10/18 do not document any ongoing suicidal . . . ideation."); ECF No. 79-11, at 347 ("The notes do not show you are having thoughts of harming yourself or others.").

experienced recent thoughts of suicide, self-harm, or harm to others[.]"[203] Premera further vigorously argues that the various post-July 10, 2018 record references to suicidal ideation change nothing because they are "sporadic,"[204] "overlap with contemporaneously-dated therapy notes" denying self-harm or suicide thoughts,[205] or, in the case of the suicide attempt reference, are simply incorrect.[206]

But here is the rub. None of this reasoning or analysis is present in Premera's denial letters or those of the external reviewers. "[C]ourts will consider only 'those rationales that were specifically articulated in the administrative record as the basis for denying a claim.'"[207] All of the letters simply—and wrongly—claim that the records do not show self-harm or suicide thoughts after July 10, 2018.[208] The letters do not attempt to explain why the suicidal ideations, while relevant to the InterQual Criteria, were not enough to satisfy the guidelines. They do not contend that the handful of suicide references were not credible or useful to the medical necessity determination because they were contradicted by other records. They do not explain the weight, or lack thereof, assigned to those records. Instead, the denial letters are written as if the suicidal ideation and self-harm records simply do not exist.

This failure violates ERISA. Under the applicable regulations, plan administrators have a "greater fiduciary duty" to "provide a full and fair review of the evidence presented, through a

---

[203] Def.'s Opp'n 9.
[204] *Id*.
[205] Def.'s Mot. Summ. J. 12.
[206] Def.'s Opp'n 9.
[207] *Spradley*, 686 F.3d at 1140 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007), *overruled on other grounds by David P.*, 77 F.4th 1293)).
[208] *See* ECF No. 79, at 34–35 (denial ltr. dated July 10, 2018); ECF No. 79-3, at 24–25 (Level I appeal denial ltr. dated Jan. 14, 2019); ECF No. 79-11, at 344–45 (Level II appeal denial ltr. dated Apr. 22, 2019); ECF No. 79-3, at 28–30 (external review ltr. dated Jan. 14, 2019); ECF No. 79-11, at 346–50 (external review ltr. dated Apr. 15, 2019).

reasonable process, as consistent with the plan."[209] While it may have been entirely accidental, Premera's denial of C.B.'s suicidal ideations was not an isolated mistake about a single record. Nor was it a mistake by a single reviewer—both of the Premera administrative personnel and both of the medical reviewers made the same error. And their errors were compounded by the failure to address the suicide thoughts identified in Robert B.'s Level II appeal.

In short, Premera's denial and review letters do not cite the relevant medical records on suicide, the conclusory statements in them about the absence of suicidal ideation are contradicted by the record, and the final two denial letters fail to engage with the suicidal ideation evidence cited in Robert B.'s final appeal. This was not the "full and fair review" ERISA requires,[210] nor did it result in the "meaningful dialogue ERISA mandates."[211]

### c.   Engagement with Medical Necessity Opinion Letters

Plaintiffs also argue Premera acted arbitrarily and capriciously by "wholly ignoring" the opinions of C.B.'s treating professionals.[212] For its part, Premera asserts reviewers considered the letters but decided that continued coverage was not medically necessary "based on the totality of the record."[213]

With his appeals, Robert B. included four letters: three from C.B.'s former treating professionals: Christine Olson ("Nurse Olson"), Chris Shepley ("Counselor Shepley"), and

---

[209] *D.K.*, 67 F.4th at 1239.
[210] *David P.*, 77 F.4th at 1300 (citing *Sage*, 845 F.2d at 893–94).
[211] *Id.* at 1315.
[212] Pls.' Mot. Summ. J. 25–26.
[213] Def.'s Opp'n 11.

Counselor Hawks;[214] and one from Michael S. Connolly ("Dr. Connolly").[215] The court briefly surveys each letter.

First, Nurse Olson is a provider at a Walla Walla, Washington family practice.[216] Her December 3, 2018 letter states she treated C.B. for 10 years and describes C.B.'s ASD, "difficulties with major severe depression and anxiety[,]" bouts with depression and suicidal ideations, and difficulties functioning at home or school.[217] She opines that it was "very apparent that [C.B.] would benefit from inpatient treatment or a specialized school environment" and that C.B.'s challenges likely would persist even into adulthood.[218]

Next, Counselor Shepley is a licensed mental health counselor in Walla Walla, Washington. From September 2016 to June 2018, he held weekly outpatient sessions for C.B.'s major depression and ASD.[219] Counselor Shepley states that C.B. has extreme depression with suicidal impulses, little motivation for life activities, and aggressive behaviors. He recommends more intensive treatment in a "very structured setting."[220] Last, he states that he "strongly disagree[s]" with Premera's coverage decision and "greatly fear[s]" what would happen to C.B. if treatment were terminated.[221]

Robert B.'s third letter comes from Counselor Hawks, C.B.'s primary therapist at Elevations starting October 2018. The February 12, 2019 letter summarizes C.B.'s condition as

---

[214] *See* ECF No. 79-1, at 205 (letter from Christine Olson); *id.* at 207 (letter from Chris Shepley); ECF No. 79-7, at 123–24 (letter from Phyllis Hawks).
[215] ECF No. 79-6, at 38–39.
[216] ECF No. 79-1, at 205.
[217] *Id.*
[218] *Id.*
[219] *Id.* at 207.
[220] *Id.*
[221] ECF No. 79-1, at 207.

of her admission to Elevations's main program.[222] Counselor Hawks describes C.B.'s anxiety and depression and her social difficulties. Then, she notes C.B.'s "passive suicidal references" in November 2018 and suicidal thoughts in January 2019.[223] She recommends that C.B. remain at Elevations given "[C.B.]'s past experiences of suicidal ideation[.]"[224] According to Counselor Hawks, "discharging [C.B.] prematurely will jeopardize his therapeutic progress and significantly place him at high risk for severe regression."[225]

The last letter is from Elevation's medical director, Dr. Connolly. He addresses his undated letter to "Whom it May Concern."[226] It is titled "Re: Anthem Psychiatric Disorder Criteria."[227] The letter does not refer to C.B.'s treatment at Elevations or to C.B. whatsoever. Instead, it clearly is a letter from another case involving a different company's criteria. The letter says nothing about C.B.'s symptoms or needs. Accordingly, there was no need for Premera to consider or address it, and the court does not discuss it further.

In its briefing, Premera offers various detailed explanations for why the other three letters from those who treated C.B. did not "justif[y] her continuing confinement outside her community for a year."[228] Premera contends that none of the treaters were psychiatrists, that it does not consider any of the letters to be "a medical record or assessment prepared at the time of C.B.'s stay at Elevations," that the letters did not adequately discuss medical necessity, and that

---

[222] ECF No. 79-7, 123.
[223] *Id.* at 123–24.
[224] *Id.* at 124.
[225] *Id.*
[226] ECF No. 79-6, at 38.
[227] *Id.*
[228] Def.'s Opp'n 12.

the letters were advocacy pieces.[229] Whatever the merits of these explanations, the problem is that none of them were offered in the denial letters or medical reviews.

The denial letters and third-party reviews say that the letters were received and reviewed. Premera stated in the second denial letter that it reviewed Robert B.'s Level I appeal request, which included Nurse Olson's and Counselor Shepley's letters.[230] The first independent medical reviewer did the same.[231] And the second external reviewer confirmed that he looked at all three letters.[232] So, too, Premera, as it stated in the third denial letter.[233]

However, other than listing the letters as received or reviewed, none of the denial or review correspondence substantively addressed the treaters' opinions. They do not discuss or reference the opinions whatsoever, leaving both the beneficiary and the court with no way of discerning whether they actually were engaged with substantively at all. The denials are simply devoid of what weight, if any, Premera accorded these opinions.

"It cannot be that the depth of an administrator's engagement with medical opinion would be revealed only when the record is presented for litigation."[234] It is true that ERISA does not put "a heightened burden of explanation on administrators when they reject a treating physician's opinion."[235] Plan administrators need not "accord special deference to the opinions of [the beneficiary's] treating physicians."[236] By the same token, reviewers "cannot shut their

---

[229] *Id.* at 11–14; Def.'s Mot. Summ. J. 28–29; Def.'s Reply 11–13.
[230] ECF No. 79-11, at 326.
[231] ECF No. 79-3, at 29.
[232] ECF No. 79-11, at 346.
[233] *Id.* at 344 (reviewing the appeal requests). Plaintiffs' Level II appeal included Counselor Hawks's letter. *See* ECF No. 79-7, at 122.
[234] *D.K.*, 67 F.4th at 1241.
[235] *Rasenack*, 585 F.3d at 1325 (citation omitted).
[236] *Nord*, 538 U.S. at 831.

eyes to readily available information . . . that [may] confirm the beneficiary's theory of entitlement . . . ."[237] Plan administrators are "required to engage with and address" treater opinions.[238] "By not providing an explanation for rejecting or not following these opinions, that is, not 'engaging' with these opinions, [the plan administrator] effectively 'shut[s] its eyes' to readily available medical information."[239] "This is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to the opinions."[240]

Here, there was no response to, or even substantive mention of, Plaintiffs' treater opinions. If Premera thought them insufficient to support coverage because of when they were written, who wrote them, or what information they did or did not cover, Premera needed to say something in its denial letters or medical reviews. Premera did not "respond to the opinions."[241] It did not "engage" with them.[242] By failing to do so, Premera acted arbitrarily and capriciously, violating ERISA.

### d.    Premera's Additional Arguments

In addition to the issues above, Premera offers three other grounds to defend against Plaintiffs' claims. Premera argues that Elevations was not the least intensive treatment, that C.B.'s absences from Elevations justify declining coverage, and that Elevations did not provide all of the required services. Because none of these arguments cure the violations noted above, the court addresses them briefly.

---

[237] *Gaither*, 394 F.3d at 807.
[238] *D.K.*, 67 F.4th at 1237.
[239] *Id.*
[240] *David P.*, 77 F.4th at 1311 (quoting *D.K.*, 67 F.4th at 1241).
[241] *D.K.*, 67 F.4th at 1241.
[242] *David P.*, 77 F.4th at 1315.

*Lower Level of Care*

Premera argues that "C.B.'s year-long stay at Elevations was not medically necessary because C.B. could have been treated with a less-intensive level of care than residential treatment."[243] Premera notes that the InterQual Criteria recommend residential treatment "in cases where an individual cannot be managed safely in the community," contends that the records show that "C.B. was not a danger to herself or others," and describes other available treatment options.[244] As noted earlier, the same Premera reviews that concluded that a lower level of care was warranted also incorrectly found that the records did not show any suicidal ideation after July 10, 2018. That error, together with the failure to consider the safety concerns expressed in the treater opinions, undermines the lower-level-of-care conclusion reached in the Premera reviews.

*Absences from Elevations*

Premera also very briefly argues that "C.B.'s repeated absences from Elevations undermine Plaintiff[s'] medical necessity claim."[245] Some of the denial letters and reviews reference these excursions, with the Level I appeal external reviewer noting that C.B. "has been considered safe enough to go out on camping trips, visits home, and other activities in the facility which incorporate mountain biking, rafting, and skiing."[246] However, because these same reviewers erroneously found that the record contained no evidence of suicidal ideation, their safety assessments remain deficient.

---

[243] Def.'s Mot. Summ. J. 24.
[244] *Id.* at 25–26; Def.'s Reply 4–5.
[245] Def.'s Mot. Summ. J. 26; Def.'s Reply 5.
[246] ECF No. 79-3, at 30.

34

*Intensity of Services*

Last, Premera argues that Elevations did not provide all of the evaluations and assessments outlined in the InterQual Criteria.[247] Some, but not all, of the denial letters discuss this issue in highly variable ways. The January 10, 2018 denial letter suggests that the required services were not received during a camping trip.[248] The January 14, 2019 Level I appeal denial letter says nothing about it.[249] The medical review of the same date does not specifically identify the required evaluations or assessments, but instead categorically states that "[n]one of the InterQual [C]riteria Residential Treatment Episode Day 16-X: Extended Stay, are met."[250] The April 15, 2019 medical review finds that Elevations "does not provide the intensity of services required at this level of care," and then provides a mixed review of what the InterQual Criteria require, what C.B. received, and what C.B. did not receive.[251] The discussion is not clear about whether some of the required evaluations and assessments never occurred during C.B.'s entire year-long stay or instead sometimes did and at other times did not. The final denial letter, dated April 22, 2019, simply says that there are no clinical notes that C.B. received a "psych evaluation" during a camping trip.[252]

The variable and changing way in which the denial letters and reviews treat the intensity of services issue would make it very difficult for the beneficiaries to discern the precise evaluation and assessment defects being identified by Premera. The bookend denial letters seem focused on a specific camping trip. In between them, some of the other correspondence either

---

[247] Def.'s Mot. Summ. J. 23–24; Def.'s Reply 2–4.
[248] ECF No. 79, at 35.
[249] ECF No. 79-3, at 25.
[250] *Id.* at 30.
[251] ECF No. 79-11, at 349.
[252] *Id.* at 344.

says nothing specific about the issue or goes into some depth. It may be that failure to provide all required services at all times is a basis for denying coverage. However, based on the inconsistent discussion of the issue in the letters and the other previously discussed incorrect statements by the reviewers on suicidal ideation and failure to engage with the treaters' medical opinions, this issue does not preclude remand, which the court discusses next.

### C.    Remand for Further Consideration

Having determined Premera acted in an arbitrary and capricious manner, the court must decide whether to remand for the plan administrator's "renewed evaluation of the claimant's case" or to award benefits.[253] The decision "hinges on the nature of the flaws in the administrator's decision."[254] Typically, "remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."[255] "But if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[256]

Here, Premera did not provide C.B. a "full and fair review."[257] It rejected, without explanation or record support, Plaintiffs' arguments that C.B. had qualifying symptoms in the form of suicidal ideations. It wrongly found that there was no evidence of suicidal ideation after

---

[253] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quoting *Flinders*, 491 F.3d at 1193).
[254] *Carlile*, 988 F.3d at 1229 (citation omitted).
[255] *David P.*, 77 F.4th at 1315 (cleaned up); *see id.* ("[R]emand is more appropriate where plan administrator failed to make adequate factual findings or failed to explain adequately the grounds for its decision to deny benefits, but not if the administrator instead gave reasons that were incorrect." (citing *Spradley*, 686 F.3d at 1142)); *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) (concluding remand as the proper remedy when the "problem is with the integrity of [the plan administrator]'s decision-making process").
[256] *David P.*, 77 F.4th at 1315 (cleaned up).
[257] 29 U.S.C. § 1133(2).

July 10, 2018, when, in fact, there was. And Premera did not meaningfully engage with letters from C.B.'s treatment providers potentially providing support for treatment.

Remand is thus the proper remedy.[258] The court declines to award benefits for C.B.'s entire year-long stay[259] because, having reviewed the evidence, the court cannot say the "record clearly shows" coverage is warranted.[260]

## II.   Parity Act Claim

Plaintiffs next assert Premera violated MHPAEA. The Parity Act, "codified at 29 U.S.C. § 1185a, is an amendment to ERISA that is enforced through equitable relief under § 1132(a)(3)."[261] "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[262] Under MHPAEA, "[t]reatment limitations include both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage."[263]

A "comparison of treatment limitations under MHPAEA must be between mental health/substance abuse and medical/surgical care 'in the same classification.'"[264] For example,

---

[258] Plaintiffs argue they are entitled to attorney's fees. Pls.' Mot. Summ. J. 37. However, because the court remands for further consideration by Premera, the issue of attorney's fees is not yet ripe. *See David P.*, 77 F.4th at 1316–17.
[259] Pls.' Mot. Summ. J. 35–36.
[260] *David P.*, 77 F.4th at 1315. Neither can the court say C.B. is "clearly *not* entitled to the claimed benefits." *Id.* (emphasis added).
[261] *Peter M. v. Aetna Health & Life Ins.*, 554 F. Supp. 3d 1216, 1226 (D. Utah 2021).
[262] *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019) (quoting *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016)).
[263] 29 C.F.R. § 2590.712(a).
[264] *Peter M.*, 554 F. Supp. 3d at 1226–27 (quoting 29 C.F.R. § 2590.712(c)(4)(i), 2(ii)(A)).

"if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit."[265] But plans need not have identical coverage criteria. A plan complies with MHPAEA if "any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification *are comparable to, and are applied no more stringently than*, [those] used in applying the limitation with respect to medical/surgical benefits . . . ."[266] Comparability, not a mirror image, is required.[267]

   As Plaintiffs correctly note, to prevail on a Parity Act claim a plaintiff must demonstrate that: (1) the Plan "is subject to MHPAEA"; (2) the Plan "provides benefits for both mental health/substance abuse and medical/surgical treatments"; (3) the plan administrator places "differing limitations on benefits for mental health care" as compared to analogous "medical/surgical care"; and (4) the differing limitations on mental health care are more restrictive than the predominant limitations based on the medical/surgical analogues.[268] "Disparate treatment limitations that violate the Parity Act can be either *facial* (as written in the

---

[265] Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008; Technical Amendment to External Review for Multi-State Plan Program, 78 Fed. Reg. 68247 (Nov. 13, 2013). In other words, the court must "identify medical or surgical care covered by the plan that is analogous to the mental health . . . care for which the plaintiffs seek benefits." *Brian J. v. United Healthcare Ins. Co.*, ___ F. Supp. 3d ____, No. 4:21-cv-00042, 2023 WL 2743097, at *8 (D. Utah Mar. 31, 2023) (citation omitted). Even if there is no clear analog, "benefits plans subject to the Parity Act 'should not be able to exclude mental health treatments only because a clear analog does not exist.'" *Johnathan Z. v. Oxford Health Plans*, No. 2:18-cv-00383, 2020 WL 607896, at *15 (D. Utah Feb. 7, 2020) (citation omitted).
[266] 29 C.F.R. § 2590.712(c)(4)(i) (emphasis added).
[267] *See Doe v. Intermountain Healthcare, Inc.*, No. 2:18-cv-00807, 2023 WL 5395526, at *26 (D. Utah Aug. 22, 2023) ("[T]he Parity Act requires comparability, not equality, between limitations.").
[268] *Peter M.*, 554 F. Supp. 3d at 1227 (citing *Michael D.*, 369 F. Supp. 3d at 1174).

language or the processes of the plan) or *as-applied* (in operation via application of the plan)."[269] The claimant carries the burden to show by a preponderance of the evidence that a plan's "limitations on mental health care are . . . more restrictive than the medical surgical analogs[.]"[270]

It is undisputed the Plan is subject to the Parity Act and covers mental health care and medical/surgical treatments.[271] At issue is whether Premera applies more restrictive limitations on claims for mental health benefits compared to medical/surgical care. To this end, Plaintiffs contend Premera committed a facial violation in four ways.[272]

### A.    Plaintiffs Have Not Demonstrated Standing to Assert a Parity Act Violation as to Inpatient Hospice Care.

Plaintiffs first contend Premera applies more restrictive limitations to residential treatment than for analogous medical/surgical care because of how it analyzes inpatient hospice care. Before addressing this argument, the court must determine if Plaintiffs have standing.[273]

"There is no ERISA exception to Article III" of the United States Constitution.[274] Article III standing requires the claimant to show that: "(1) she has suffered an actual or threatened injury in fact; (2) the injury is causally connected to the conduct complained of; and (3) it is

---

[269] *Brian J.*, 2023 WL 2743097, at *8 (citation omitted).

[270] *M.Z. v. Blue Cross Blue Shield of Ill.*, No. 1:20-cv-00184, 2023 WL 2634240, at *21 (D. Utah Mar. 24, 2023); *see Stone v. UnitedHealthcare Ins.*, 979 F.3d 770, 774 (9th Cir. 2020); *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-00038, 2021 WL 2532905, at *20 (D. Utah June 21, 2021), *appeal dismissed*, No. 21-4089 (10th Cir. Nov. 30, 2021); *Kevin D. v. Blue Cross & Blue Shield of S.C.*, 545 F. Supp. 3d 587, 613 (M.D. Tenn. 2021), *appeal dismissed*, No. 21-5703, 2021 WL 6689154 (6th Cir. Nov. 19, 2021).

[271] *See, e.g.*, ECF No. 79-11, at 356–457.

[272] Plaintiffs originally argued that Premera violated the Parity Act in seven ways. Pls.' Mot. Summ. J. 31–35. However, Plaintiffs concede three of their arguments. *See* Pls.' Reply in Support Mot. Summ. J. ("Pls.' Reply") 12, ECF No. 74, filed May 2, 2023 (conceding whether Premera violates MHPAEA because InterQual Criteria do not advise reviewers to consider a patient's safety if they are discharged from residential treatment, whether the Plan excludes wilderness programs from coverage, and whether the Plan imposes differing standards of review for external reviewers).

[273] "[S]tanding is a component of this court's jurisdiction, and [it is] obliged to consider it sua sponte to ensure the existence of an Article III case or controversy." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1176 (10th Cir. 2009); *see Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

[274] *Thole v. U.S. Bank N.A.*, 590 U.S. ____, 140 S. Ct. 1615, 1622 (2020).

likely, and not merely speculative, that [the] injury will be redressed by a favorable decision."[275] For causation, a claimant must show a "nexus between the allegedly violative language and [the plan administrator]'s decision to deny benefits."[276] "Redressability is established if 'it is likely that the injury will be redressed by a favorable decision.'"[277]

Plaintiffs do not have standing to make this claim. They argue Premera imposes InterQual Criteria to claims for mental health treatment at an RTC[278] and to medical/surgical treatment at a skilled nursing facility ("SNF") or an inpatient rehabilitation facility ("IRF")[279] but not to those for inpatient hospice. Yet the Plan does not allow for more than ten days' coverage for hospice care.[280] Meanwhile, Premera covered thirty days of RTC care at Elevations for C.B.[281] Plaintiffs' claim in this case is based on a lack of coverage from Day 31 forward. That Premera does not apply InterQual Criteria to inpatient hospice care for the maximum ten-day covered stay is entirely unrelated to Plaintiffs' claim for much more lengthy coverage beyond ten days. Whether conceived as a lack of injury, causation, or redressability, Plaintiffs do not have standing. The facts of this case simply do not support it.

### B. Plaintiffs Have Not Otherwise Met their Burden to Show a Parity Act Violation.

Next, Plaintiffs argue Premera violated the Parity Act in three other ways. They assert the medical necessity criteria for residential treatment under the InterQual Criteria are more

---

[275] *Jonathan Z. v. Oxford Health Plans*, No. 2:18-cv-00383, 2022 WL 2528362, at *18 (D. Utah July 7, 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).
[276] *Id.*
[277] *Frank v. Lee*, ___ F.4th ____, No. 21-8058, 2023 WL 6966156, at *9 (10th Cir. Oct. 23, 2023) (quoting *Kitchens v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014)).
[278] ECF No. 79-6, at 100–09.
[279] *Id.* at 113–31.
[280] ECF No. 79-11, at 370.
[281] *See supra* note 82.

restrictive than for analogous skilled nursing or inpatient rehabilitation treatment.[282] Next, they contend the medical necessity criteria for medical/surgical care at SNFs and sub-acute IRFs consider risk of relapse while the criteria for mental health/substance use disorder at sub-acute IRFs do not.[283] Last, they claim the medical necessity criteria classify mental health/substance use disorder treatment longer than 15 days at an RTC as an "Extended Stay" that requires extra authorization and evaluation unlike criteria for medical/surgical treatment at an SNF or IRF.[284] Premera responds by arguing MHPAEA does not require identical coverage criteria for analogous mental health and medical/surgical services. It asserts the Plan criteria focus on the appropriate level of care[285] and thus the policies are in parity.

The InterQual Criteria state that they "are derived from the systematic, continuous review and critical appraisal of the most current evidence-based literature and include input from [an] independent panel of clinical experts."[286] Written by a panel of 1,100 doctors and referencing 16,000 medical sources,[287] the criteria are "nationally recognized, third-party guidelines."[288] They provide "structure for analyzing a patient's particular symptoms, diagnoses, risks, and circumstances to determine what level of care is medically necessary."[289] "Federal courts across

---

[282] Pls.' Mot. Summ. J. 32 (*comparing* ECF No. 79-6, at 100–09, 113–31, *with* ECF No. 79-11, at 262–65).

[283] *Id.* at 32–33 (*comparing* ECF No. 79-6, at 100–09, 113–31, *with* ECF No. 79-11, at 244–323).

[284] *Id.* at 34 (*comparing* ECF No. 79-11, at 264–65, *with* ECF No. 79-6, at 100–09, 113–31).

[285] *See* Def.'s Opp'n 22–23 (noting "the patient's symptoms and the least intensive services required to treat them" (citing ECF No. 79-11, at 245–85)).

[286] ECF No. 79-11, at 245; *see Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1115 (9th Cir. 2020).

[287] *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017).

[288] *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 114 (1st Cir. 2017); *see Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 43 (W.D.N.Y. 2020) ("The InterQual Criteria are nationally recognized, third-party guidelines designed to 'help healthcare organizations assess the safest and most clinically appropriate care level for more than 95% of reasons for admission.'" (citation omitted)).

[289] *Stephanie C.*, 852 F.3d at 114; *see* ECF No. 79-11, at 245 ("[InterQual Criteria] [are] intended solely for use as screening guidelines with respect to medical appropriateness of healthcare services.").

the country have recognized the widespread adoption of InterQual Criteria and 'district courts routinely find that InterQual's criteria comport with generally accepted standards of care.'"[290]

     As noted above, Plaintiffs assert three differences between the InterQual Criteria for RTC care and criteria for analogous medical/surgical care at SNFs or IRFs, contending that there is a disparity between the criteria on weekly serious psychiatric symptoms, risk of decline or relapse, and extended stay criteria.[291] Yet Plaintiffs do little beyond identifying these differences. They summarily conclude in a few sentences that the medical necessity criteria for one type of care "are more stringent," are "more restrictive," and "make[] it more difficult" to obtain coverage than for others.[292] What is more, after Premera responds, Plaintiffs limit their reply to briefly addressing only the alleged weekly-symptoms disparity.[293] This is not enough to satisfy their burden. This case is not at the pleadings stage, where plausibility is the standard. To establish a Parity Act violation, Plaintiffs must demonstrate, by a preponderance of the evidence, that mental health coverage is being treated more restrictively than its medical/surgical analogues. On this record, simply noting that criteria used for evaluating medical necessity for different illnesses and injuries have one or more differences is necessary, but not sufficient, to prevail on such a claim under the preponderance standard. As a general matter, simply "imposing different medical criteria for coverage based on the illness or ailment 'is not an impermissible disparity; it is a

---

[290] *S.L. by & through J.L. v. Cross*, ___ F. Supp. 3d ____, No. C18-1308, 2023 WL 3738991, at *10 (W.D. Wash. May 31, 2023) (quoting *N.F. by & through M.R. v. Premera Blue Cross*, No. C20-956, 2021 WL 4804594, at *4 n.4 (W.D. Wash. Oct. 14, 2021)) (citing *Winter*, 953 F.3d at 1114–15; *Griffin v. Do-Williams*, No. C16-1435, 2019 WL 3975358, at *8 (E.D. Cal. Aug. 22, 2019), *aff'd*, 846 F. App'x 518 (9th Cir. 2021) (unpublished); *Norfolk Cnty.*, 877 F.3d at 690; *Stephanie C.*, 447 F. Supp. 3d 38); *see E.W. v. Health Net Life Ins. Co.*, No. 2:19-cv-00499, 2021 WL 4133950, at *7 (D. Utah Sept. 10, 2021).
[291] Pls.' Mot. Summ. J. 32–34.
[292] *Id.* at 32, 33, 34.
[293] Pls.' Reply 11–12.

logical consequence of the undeniable reality that every illness is inherently different and requires different treatment.'"[294]

Of course, depending on the record, different criteria used in different areas certainly can result in impermissible disparities. Here, Plaintiffs fail to show how treatment limitations on mental health/substance use disorders benefits are more restrictive than the limitations for medical/surgical analogs. They bear the burden to do so. For this reason, on this record, the court must deny Plaintiffs summary judgment and grant Premera summary judgment on the Parity Act claim.

## ORDER

Accordingly, the court GRANTS IN PART, DENIES IN PART, and DISMISSES IN PART Plaintiffs' Motion for Summary Judgment;[295] and GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment.[296]

1.　For Count I, the court GRANTS IN PART Plaintiffs' motion and DENIES Defendant's motion. The court REMANDS to Defendant for further review of Plaintiffs' benefits claim consistent with this Memorandum Decision and Order.

2.　For Count II, the court DISMISSES IN PART and DENIES IN PART Plaintiffs' motion and GRANTS IN PART and DENIES IN PART Defendant's motion. The court DISMISSES Plaintiffs' Parity Act claim as to inpatient hospice care for lack of standing. Summary judgment is DENIED for Plaintiffs and GRANTED for Defendant on Plaintiffs' other Parity Act claims.

---

[294] *Doe*, 2023 WL 5395526, at *26 (quoting *James C.*, 2021 WL 2532905, at *20); *see Jonathan Z.*, 2022 WL 2528362, at *17 (citing 29 U.S.C. § 1185a(a)(3)(A)).
[295] ECF No. 70.
[296] ECF No. 85.

Signed November 3, 2023.

BY THE COURT

_____

David Barlow
United States District Judge